UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DEMOND BRANCH #229690,

          Plaintiff,

   v.

GREG RENNARD, et al.,

          Defendants.

_____/

Case No. 2:20-cv-00225

Hon. Paul L. Maloney
U.S. District Judge

## REPORT AND RECOMMENDATION

### I. Introduction

This Report and Recommendation (R&R) addresses the summary judgment motion filed by Defendants.   (ECF No. 36.)

The Plaintiff in this case – state prisoner Demond Branch – filed this civil rights action pursuant to 42 U.S.C. § 1983.   He alleges that his rights were violated while he was confined at the Kinross Correctional Facility.   (ECF No. 1.)   Plaintiff's verified complaint alleged that Defendants Corrections Officer (CO) Renard and Registered Nurse (RN) Hesselink violated his Constitutional rights by denying him immediate medical treatment for a diabetic reaction.   (*Id.*)   Branch further says that Defendant Renard retaliated against him after he requested immediate medical attention from the nurse while he was waiting to receive his insulin injection.   (*Id.*)

The record establishes that during the morning of September 7, 2018, Branch was waiting in the lobby of the prison health services for his turn to receive an insulin injection.   RN Hesselink was administering dosages of insulin to prisoners.   At

some point, Branch began yelling for a nurse because he wanted his insulin shot immediately.   Branch claims that he was shaking and sweating and that he was having a diabetic reaction.   CO Renard ordered Branch to stop yelling and to sit down and wait.   Branch refused to comply with the order and continued to stand and yell for a nurse.   CO Renard ordered Branch to leave health services and to wait outside because he was creating a disturbance.   Branch complied by leaving but he walked to the control center where he complained.   A sergeant escorted Branch back to health services and RN Hesselink gave Branch his insulin injection.

In the opinion of the undersigned, Defendants have established that no genuine issue of material fact exists with respect to Branch's retaliation and Eighth Amendment deliberate indifference claims.   Thus, it is respectfully recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

## II.  Factual Allegations

Branch says that on September 7, 2018, he reported to health services to receive one of his two daily doses of insulin.   (ECF No. 1, PageID.7.)   After waiting for some time, Branch informed CO Renard that he needed to see the nurse because he is a diabetic.   (*Id.*)   CO Renard told Branch to sit on the bench and wait.   (*Id.*) Branch says that he complied with the order and sat down, but he began experiencing severe hypoglycemia[1] symptoms of shaking and sweating.   (*Id.*)

---

[1]      Hypoglycemia is a condition involving low blood sugar and is treated by giving the individual sugar.   (ECF No. 37-10, PageID.336.)   Hyperglycemia is a condition involving high blood sugar and is treated by giving the individual insulin.   (*Id.*,

Branch says that he began calling for the nurse for immediate assistance, but CO Renard again told him to sit down.  (*Id.*, PageID.7-8.)  Branch says that he ignored CO Renard's order because he felt that it was unreasonable.  (*Id.*, PageID.8.) Branch believed that at any moment he could have a seizure, slip into a coma, or die. (*Id.*)  CO Renard then told Branch that he would receive a misconduct ticket if he did not sit down.  (*Id.*)  Branch refused and continued to call for the nurse.  (*Id.*)

CO Renard responded by ordering Branch to leave health services.  (*Id.*) Branch left health services and immediately went to the control center and asked to see a supervisor.  (*Id.*)  A sergeant escorted Branch back to health services and took him directly to RN Hesselink who administered Branch's insulin shot.  (*Id.*, PageID.8-9.)  Branch says that RN Hesselink witnessed Branch yelling for a nurse and CO Renard ordering Branch to sit down, but she denied him treatment at that time.  (*Id.*, PageID.9.)

Branch says that CO Renard retaliated against him for exercising his Eighth Amendment right to medical care by issuing a misconduct ticket for disobeying a direct order.  (*Id.*, PageID.9-10.)  Branch concedes that he was found guilty of the misconduct but argues that the order he disobeyed was unreasonable.  (*Id.*, PageID.10.)

### III.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to

---

PageID.337-338.)

judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).   The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).   The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## IV.  Retaliation

Branch asserted in his complaint that CO Renard retaliated against him by issuing him a misconduct ticket for disobeying a direct order after Branch refused CO Renard's order to sit down.   Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.   *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).   In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.   *Id*.

### a.   Protected Conduct

Branch argues that he engaged in protected conduct when he began yelling for a nurse in health services because he wanted his insulin shot immediately.   Branch receives two insulin shots each day.   During the morning of September 7, 2018, Branch reported to health services to receive his insulin shot.   While waiting, he says he began experiencing an insulin reaction and began yelling for a nurse because he could no longer wait for the nurse to finish with other prisoners before he received his insulin shot.

Branch argues that by yelling for a nurse, he engaged in protected conduct under the First and Eighth Amendments.   An inmate "retains [only] those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."   *Pell v. Procunier*, 417 U.S. 817, 822 (1974).   In determining whether an inmate's speech is protected, context matters.   *Thaddeus-X*, 175 F.3d 388.

Branch was yelling for a nurse to immediately give him his insulin injection while he was waiting for his turn in health services to receive the injection.   He continued to yell even after CO Renard ordered him to sit down and wait.   "[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct.'"   *Id.* at 395.   Protected conduct does not include a prisoner's aggressive attitude and attempts to intimidate staff members.   *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).   Once Branch was ordered to sit down and to stop yelling, his conduct and subsequent refusal to follow that order cannot be considered

protected conduct because he was violating a legitimate prison regulation.   (ECF No. 37-5, PageID.239) (MDOC Policy Directive 03.03.105B) (stating that refusal to follow a valid and reasonable order can result in a disobeying-a-direct-order misconduct ticket).)

Branch argues that CO Renard's order was unreasonable.   However, under the MDOC Prisoner Guidebook, Branch is required to obey all directions and instructions from staff.   After complying with the order, a prisoner may grieve orders that he believes were unfair or unreasonable.

### RULES OF GENERAL CONDUCT

1.    All prisoners are required to obey directions and instructions of all staff members.  If a prisoner feels s/he has been dealt with unfairly, or that s/he has received improper instructions, s/he should first comply with the order and then follow the established grievance procedure outlined later in this book.

(ECF No. 37-6, PageID.246.)

In the opinion of the undersigned, Branch was not engaging in protected conduct while yelling for a nurse and refusing CO Renard's order to stop yelling and to sit down.

### b.    Adverse Action

The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted.   The relevant question is whether the defendant's conduct is "*capable* of deterring a person of ordinary firmness".   *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original).   Defendant does not challenge Branch's assertion that his receipt of a misconduct ticket was adverse conduct.

### c.  Causation

To satisfy the third element of a retaliation claim, Branch must show that CO Renard issued the misconduct ticket due to Branch's protected conduct.   To prevail on a retaliation claim, retaliatory motive "must be a 'but-for' cause [of the injury], meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."   *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019).   The Sixth Circuit employs a burden-shifting approach with regards to the causal requirement:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant.   If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Thaddeus-X*, 175 F.3d at 399.

Branch received the misconduct ticket because he failed to comply with CO Renard's order to stop yelling and to sit down.   Branch admits that he did not comply with the order because he felt it was unreasonable.   Branch's affidavit states:

> 10.  That Renard threatened affiant with a Major Misconduct ticket, if he didn't sit down and shut up. Affiant continued to call for a nurse for medical care.

(ECF No. 39-9, PageID.416 (Branch's affidavit).)

At the misconduct hearing, the hearing officer wrote that Branch stated that he complied with CO Renard's order, and he then left health services because he was not timely called by a nurse.   Branch was found guilty of disobeying a direct order.

| MISCONDUCT VIOLATION | | |
|---|---|---|
| Hearing<br>Class II  ☒<br>Class III  ☐ | Misconduct Charges<br>**Disobeying a Direct Order** | |
| Misconduct Charge if Changed by Hearing Officer | | Plea<br>☐ Guilty     ☒ Not Guilty |

**WAIVER OF HEARING**

| I understand I have a right to a hearing.  I waive my right to a hearing and plead guilty to all charges.  I also waive my right to appeal and accept the sanctions imposed. | Prisoner's Signature | Date |
|---|---|---|

**HEARING REPORT (Do Not Complete If Hearing Waived)**

Evidence and/or prisoner statement in addition to misconduct report:  Prisoner is present for the hearing of his misconduct and is pleading  not guilty to the charge of Disobeying a Direct Order.  The prisoner states that he complied with C/O Renard's order, and was not yelling nor making a scene in Health Care.  The prisoner states that he left Health Care because he was not being seen in a timely fashion, and that a female Sgt. escorted him back to Health Care moments later to receive his insulin medicine.

Reasons for findings:  Prisoner Branch acknowledges that a conversation took place between himself and C/O Renard.  I spoke with LPN Hesselink and she stated that prisoner Branch was yelling and screaming in Health Care, and was told to go sit on the bench more than once by C/O Renard.  I find that C/O Renard is credible in his statements and would have no reason not to be factual.  Per PD 03.03.105 I find the prisoner guilty of the charge of Disobeying a Direct Order.

**FINDINGS**

| Charge 1  ☒ Guilty     ☐ Not Guilty | CMIS Code 420 |
|---|---|

(ECF No. 37-4, PageID.220.)

The record before the Court establishes that Branch received the misconduct ticket for his refusal to comply with CO Renard's order.   The problem here is not that Branch was asking for an insulin shot before other prisoners; the problem is the manner in which he made the request.   It is undisputed that Branch began yelling while waiting in line.   (*See* ECF No. 37-3 (Renard's affidavit); ECF No. 39-9 (Branch's affidavit).)   It is clear that CO Renard was attempting "to maintain the

safety, security, and good order of the facility" rather than retaliating against Branch for voicing his concerns about his medical situation.    (ECF No. 37-3, PageID.215.) In the opinion of the undersigned, Defendants have established that no genuine issue of fact exists to support Branch's retaliation claim.[2]

### V.  Eighth Amendment

Branch claims that Defendants violated his Eighth Amendment rights when they refused to give him his insulin shot after he began calling for a nurse while he was waiting for an available nurse in health services.    The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.    The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as the failure to provide such care would be inconsistent with contemporary standards of decency.    *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).    The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.    *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

---

[2]    Branch did not allege a retaliation claim in his complaint against RN Hesselink.    (ECF No. 1.)    In his response to Defendants' motion for summary judgment, Branch argues that RN Hesselink retaliated against him because she witnessed him yelling and refusing to comply with CO Renard's orders.    (ECF No. 39, PageID.346.)    If Branch had properly asserted a retaliation claim against RN Hesselink in his complaint, such a claim fails to establish that RN Hesselink took any retaliatory act against him.    At the time that Branch was yelling for a nurse, RN Hesselink was administering insulin injections to another prisoner and was responsible for the security of the insulin.    Even if Branch needed emergent care, RN Hesselink would not have been able to leave her position to respond.    (ECF No. 37-2, PageID.210 (Hesselink affidavit).)    Other medical staff would have responded to Branch.    (*Id.*)

A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*  "[A]n inmate who complains that ***delay in medical treatment*** rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."  *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted).  The Court of Appeals elaborated on the holding in *Napier* in its 2004 ruling in *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's ***failure to treat a condition adequately***, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added).  Thus, *Napier* and *Blackmore* provide a framework for assessing a claim of delayed or inadequate care for a non-obvious condition:  A plaintiff making this type of claim must place verifying medical evidence in the record to show the detrimental effect of the delayed or inadequate treatment.

However, the objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a

lay person." *Id.* at 899.

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834).   Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."   *Id.*   Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   *Id.* at 837.   The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018).   The court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.   Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness."   This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.

> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it."   A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful.   A doctor,

11

after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm."

*Id.* at 738–39 (6th Cir. 2018) (internal citations omitted).

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

[A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and

considerable suffering.   *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).   If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell* 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).   He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

It is undisputed that Branch is a diabetic and receives daily insulin injections. Branch was in health services on the morning of September 7, 2018, waiting to receive

13

his morning dose of insulin.   Branch claims that the delay he experienced in receiving his insulin injection caused him to have a hypoglycemic episode.

Defendants first argue that it is "highly unlikely" that Branch experienced a *hypoglycemic* episode.   (ECF No. 37, PageID.197.)   Second, Defendants argue that Branch did not exhibit any medical need to have his insulin shot any sooner than when he received it.   Branch has been diagnosed with Type II diabetes, which causes high blood sugar.   (ECF No. 37-8, PageID.292 (medical records); ECF No. 37-10, PageID.336 (James's affidavit).)   Branch receives insulin injections to reduce the blood sugar in his body.   (ECF No. 37-10, PageID.336.)

Hypoglycemia causes a person to become lethargic, unsteady, confused, and have slurred speech.   (*Id.*)   Hypoglycemia is treated by providing the individual with a sugary drink, food, or snack, and not by an insulin injection.   (*Id.*)   Branch could not have had an episode of hypoglycemia because the insulin injection he received would not have helped him.   (*Id.*)

On the other hand, *hyperglycemia* is a condition where an individual's blood sugar is too high.   (*Id.*)   An individual usually does not have a sudden attack of hyperglycemia, it develops over days or weeks and is caused by preceding high blood sugar levels.   (*Id.*, PageID.337-338.)   Hyperglycemia is treated with insulin.[3]   (*Id.*,

---

[3]      Despite this evidence, Branch continues to argue that he had hypoglycemia. (ECF No. 39-8, PageID.406-408) (Branch hand-wrote on the cover page of this exhibit "The Merck Manual of Medical Information").)   Branch bases his conclusion on this exhibit.   The exhibit is unattested and hearsay.   But even if the Court considered this exhibit, it indicates that *hypoglycemia* is treated with more sugar and not with insulin.   (*Id.*, PageID.407-408.)   So contrary to Branch's assertion that he was experiencing hypoglycemia, his insulin injection would have likely worsened his

PageID.338.)    Defendants argue that Branch's medical records show that his diabetes was under control prior to September 7, 2018.   (ECF No. 37, PageID.198.) However, Branch's medical records show that he had a chronic care visit on August 15, 2018, and that he was not seen again for another health care appointment until his September 17, 2018, chronic care visit.   (*Id.*, PageID.314-317.)

As Defendants seem to concede by arguing that it is "highly unlikely" that Branch experienced hyperglycemia, it is possible that Branch could have had a hyperglycemia episode.   His condition days and a few weeks before September 7, 2018 (after August 15, 2018) is not reported in the medical records that were presented by Defendants.   In any event, Branch asserts that he thought he was having an emergent medical condition related to his diabetes due to the failure to receive his insulin injection.   In the opinion of the undersigned, a genuine issue of material fact exists on this issue.

However, the record fails to show that Defendants consciously exposed Branch to a risk of harm.   It is undisputed that Branch was waiting for an available nurse in health services to give him his insulin injection.   RN Hesselink says that on September 7, 2018, multiple prisoners were in health services to receive insulin and it was her job to administer insulin injections to prisoners on that day.   (ECF No. 37-2, PageID.209 (Hesselink affidavit).)   RN Hesselink says that the prisoners waited in the lobby area until she individually called them to receive their insulin injection.   (*Id.*)

---

condition if, in fact, he had hypoglycemia.

15

RN Hesselink attests that while she was dispensing insulin to another prisoner, she heard a prisoner yelling in the lobby area for a nurse. (*Id.*) She looked down the hall and observed Branch yelling for a nurse. (*Id.*) CO Renard told Branch to sit down and wait for a nurse, but Branch continued to stand and yell for a nurse. (*Id.*) RN Hesselink says that based upon Branch's behavior or demeanor she did not believe that he was experiencing a medical emergency. (*Id.*) She did not observe Branch shaking or sweating, but even if she had, she would not have believed that he needed immediate medical attention based upon his conduct which included standing, yelling, and walking out of health services on his own. (*Id.*) RN Hesselink states that based upon her observations, Branch was not experiencing an episode of hypoglycemia, because he would not have been able to stand, walk, or talk in the manner that she observed. (*Id.*, PageID.210.)

Further, even if Branch was experiencing a medical emergency, RN Hesselink says that she could not have responded because she was responsible for securing "numerous syringes of insulin" and she could not have left her workstation while other prisoners were in the area. (*Id.*) Other nursing staff or medical personal in the area would have needed to respond to any emergent situation. (*Id.*) Shortly after leaving, Branch returned to health services and RN Hesselink administered his insulin injection. (*Id.*)

CO Renard told Branch to sit down and to stop yelling. (ECF No. 37-3, PageID.215.) When Branch refused, CO Renard warned him that if he refused to comply with the order, he would receive a misconduct ticket. (*Id.*) Branch

continued to yell for a nurse.    (*Id*.)    CO Renard told Branch to leave health services and wait outside because he was creating a disturbance.    (*Id*.)    CO Renard did not observe Branch sweating or shaking.    (*Id*., PageID.216.)

In the opinion of the undersigned, Branch has failed to show that Defendants acted with deliberate indifference to his serious medical needs.    Importantly, Branch failed to provide verifiable medical evidence establishing that he suffered a detrimental effect from the alleged delay in receiving his insulin injection.    As Defendants point out, Branch received his insulin injection.    *See Napier* (establishing that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based upon delay) and *Blackmore* (reiterating that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on inadequate treatment).    The medical evidence in the record does not establish that Branch suffered any medical consequences due to his perceived delay in receiving his insulin injection.    (ECF No. 37-8, PageID.318-324 (medical records between September 17, 2018, and November 6, 2018).)

## VI.  Qualified Immunity

Alternatively, Defendants assert that they are entitled to qualified immunity because Branch cannot support his constitutional claims.    "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"    *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008)

17

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   The analysis entails a two-step inquiry.   *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).   First, the court must "determine if the facts alleged make out a violation of a constitutional right."  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)).   Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it."  *Id.* (citing *Pearson*, 555 U.S. at 232).   A court may address these steps in any order.  *Id.* (citing *Pearson*, 555 U.S. at 236).   A government official is entitled to qualified immunity if either step of the analysis is not satisfied.  *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).   The court considers the state of the law at the second step.   As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017)

(internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*,

136 S. Ct. 305, 308 (2015)).    As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or a robust 'consensus of cases of persuasive authority,' " *al–Kidd*, *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix*, *supra*, at 309 (quoting *Anderson*, *supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*D.C. v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

For the reasons stated above, Branch cannot support his constitutional claims

against Defendants.    Defendants are entitled to qualified immunity.

## VII.  Official Capacity Claim

If the Court decides to allow one or more of Branch's claims to go forward, the Court should dismiss Branch's claims against Defendants in their official capacities.

To the extent that Branch seeks damages against Defendants in their official capacity, his claims are barred by the Eleventh Amendment.   The Supreme Court has held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."   *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

> A suit against a state official in his or her official capacity for damages cannot be maintained pursuant to § 1983 because that official has Eleventh Amendment immunity. This is true because "a suit against a state official in her or her official capacity is not a suit against the official but rather is a suit against the official's office." As such, a suit against a state official in his or her official capacity is no different than a suit against the state.

*Clark v. Chillicothe Corr. Inst.*, No. 2:19-CV-954, 2020 WL 1227224, at *3 (S.D. Ohio Mar. 13, 2020) (citations omitted).

The Sixth Circuit, in interpreting *Will*, has held "that plaintiffs seeking damages under § 1983 [must] set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply in their capacity as state officials.   *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir. 1989).   To the extent that Branch seeks money damages, costs, and fees from Defendants in their official capacity, that part of his lawsuit is barred by sovereign immunity.[4]

---

[4]     "There are three exceptions to a State's sovereign immunity: (a) when the State has consented to suit; (b) when the exception first set forth in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), applies; and (c) when Congress has

## VIII.   Recommendation

As set forth about, it is the opinion of the undersigned that Defendants have established that no genuine issue of material fact exists with respect to Branch's retaliation and Eighth Amendment deliberate indifference claims.   Thus, it is respectfully recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:    January 23, 2023                          /s/ *Maarten Vermaat*
                                                              MAARTEN VERMAAT
                                                              U.S. MAGISTRATE JUDGE

---

properly abrogated a State's immunity."   *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008).   Only the second exception is potentially at issue here. "Under the *Ex parte Young* exception, a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law."   *Id*. Branch requests declaratory relief.   (ECF No. 1, PageID.12.)